of the transaction. An earlier account had been closed because it was unsatisfactory, and no official of the bank, except Wollenweber, knew of the dummy accounts. Cohn paid to Wollenweber, or for his account, some $4,500, in order that he might have Wollenweber's assistance in "check kiting." Two of the checks delivered to Wollenweber to balance the overdrafts were carried as cash items, and the third was put through the Irving National Bank and returned unpaid. When Rodriguez, the vice president and manager of the defendant, learned of the overdraft on Monday, October 5th, he asked Wollenweber for an explanation, who said he was protecting a friend.

Thereupon Rodriguez told Wollenweber, if he did not make good the indebtedness, he would suffer the consequences. Wollenweber then secured repayment from Cohn on October 6th, who obtained funds by selling diamonds which he had. A petition in bankruptcy was filed on October 8, 1925, and adjudication and the appointment of the trustee followed. The question before me is whether the defendant, at the time of receiving the repayment, had reasonable cause to believe that the transfer would effect a preference; otherwise, the case does not come within the provision of section 60b of the National Bankruptcy Act (Comp. St. § 9644).

I do not regard notice to Wollenweber of Cohn's insolvency as notice to the defendant. Wollenweber was a co-conspirator, facilitating the unlawful operations of Cohn for hire. He was not engaged in the bank's business when he helped a third party to rob it, or met the drastic demands of its officers to secure repayment of the illegal withdrawals. He was protecting himself from ruin, rather than acting for the bank. His knowledge of Cohn's condition cannot be imputed. American Surety Co. v. Pauly; 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977.

Rodriguez testified that he was never informed where the repayment secured through Wollenweber came from, or that Harry A. Cohn was in financial difficulty. On the other hand, Wollenweber said that on October 6th he told Rodriguez that Cohn was disposing of all he had to cover the bank and was in financial difficulties, had left the state, and was in Newark, N. J. Undoubtedly Rodriguez found out that the checks in the possession of the bank were bad, and Kaplowitz, the cashier, had learned the same thing. Rodriguez did not tell the truth to District Attorney Pecora, when he was investigating the case, and said that he had no knowledge of the transaction. His claim that he said this to protect Wollenweber from publicity does not seem a very likely explanation, especially when he continued to reiterate the story when confronted by Wollenweber. He was apparently using every means to force Wollenweber to secure repayment of the money, and I cannot believe that he was mainly governed by solicitude for the latter's good name. It is more likely that he denied knowledge, because he was frightened and to prevent further investigation of the whole transaction. He was not under oath, and hoped to avoid additional trouble.

It seems quite clear that, but for the attempt to Rodriguez to hide the transaction, it would be quite impossible to find that he had reason to believe that the money came from Cohn and that the payment was preferential. Cohn is a convict, serving his sentence because he embezzled diamonds left in his hands on consignment. His oath ought not to outweigh the positive denials of Rodriguez in a case where he might secure favor from his creditors by helping to reclaim assets and by assisting the trustee. The most that is established is that Rodriguez and Kaplowitz knew the bank had bad checks, one of which, at least, bore the indorsement of Harry Cohn. That is different from reasonable cause to believe that the payment was preferential. The misstatement to the district attorney must be held to be the equivalent of knowledge that Cohn got the money from the overdrafts, that the money was repaid by him, and that he was insolvent, or it can have no direct bearing on the issues. I do not think the misstatement leads to these conclusions.

The bill is dismissed, without costs.

---

### In re HOPE.

District Court, W. D. Michigan, S. D. June 2, 1926.

1. **Bankruptcy** ⬅408(2)—**Refusal of discharge on ground of false oath to schedules, which omitted asset, held unwarranted.**

Bankrupt's failure to list particular asset in schedules to which he made the usual oath *held* not to warrant denial of discharge, on the ground that he had knowingly and fraudulently made a false oath, in view of the confusion of his affairs and doubtful nature of the asset omitted.

2. **Bankruptcy** ⬅408(1)—**False oath must have been knowingly and fraudulently made, with intent to defraud, to bar discharge.**

A false oath, to constitute ground for denial of discharge, must have been knowingly and fraudulently made, with willful intent to defraud.

In Bankruptcy. In the matter of the bankruptcy of Frank Hope. On objections to bankrupt's discharge. Discharge granted.

Watt & Colwell, of Ionia, Mich., for opposing creditor.

Eldred & Gemuend, of Ionia, Mich., for bankrupt.

RAYMOND, District Judge. [1] Specifications of grounds of objections to bankrupt's discharge have been filed in this matter. The specification relied upon is that bankrupt knowingly and fraudulently made a false oath in the bankruptcy proceedings, in that on the 1st day of October, 1925, he made the usual oath to schedules annexed to the petition in bankruptcy filed in this court, and that in the schedules he omitted to list among his assets an undivided one-half interest in 31 head of cattle, of the value of $300.

Testimony has been taken, from which it appears that in the spring of 1924 bankrupt became a tenant under a five-year written lease of a farm owned by Charles Spaulding. Shortly after the lease was made, cattle were purchased and 10 heifers were raised. In 1925 a contagious disease appeared among the cattle, which rendered many of them worthless. In the late summer and early fall of 1925, controversies arose between the landlord and tenant, which resulted in negotiations between the bankrupt and Mr. Spaulding to terminate the lease. Mr. Spaulding was an indorser upon notes given for the purchase price of the cattle. Bankrupt was not liable upon these notes. Mr. Spaulding testified that, at the date of filing the petition in bankruptcy, bankrupt was the owner of a half interest in the cattle, and that the 10 heifers hereafter referred to were delivered to bankrupt in settlement for his interest therein.

Bankrupt testified that his understanding was that he was to become the owner of a half interest in the cattle when the purchase price was fully paid from the proceeds of the farm. He claims that, as a result of the loss of cattle, the indebtedness on the cattle and other personal property exceeded by $3,800 the value of personal property on the farm, and that at the time of filing the petition in bankruptcy he believed he had no interest whatever therein. It is also the claim of bankrupt that in the latter part of October, 1925, Mr. Spaulding delivered to him the 10 heifers in consideration for his agreement to vacate the farm immediately and his consent to the termination of the lease.

[2] It has been repeatedly held that a false oath, to constitute sufficient ground for denial of discharge, must have been knowingly and fraudulently made. In other words, there must have been present a willful intent to defraud. It is evident, from testimony in this case, that the relations between bankrupt and his landlord at the time of filing the petition in bankruptcy were in a confused state. Controversies had arisen, and it is not difficult to understand that the bankrupt may have honestly believed, on October 1, 1925, the date on which the oath was administered, that he had no interest whatever in the cattle, because of the indebtedness still existing, and which it was claimed greatly exceeded the value of the property. If his statement is true that the heifers which were received by him several weeks later were to compensate him for the surrender of the lease, the oath taken on October 1st would bear no relation thereto. The evidence discloses that no creditor appeared at the first meeting of creditors, held October 26, 1925, and no examination of bankrupt was had. At that time the transaction in regard to the heifers had been consummated, and if creditors had then appeared and examined the bankrupt, all the facts in connection with the transaction would undoubtedly have been fully developed.

In the case of Woods v. Little (C. C. A.) 134 F. 232, the following language is used, which seems to the court to be applicable to the facts in the present case: "Without discussing in detail the particular facts and circumstances of this case, we are of opinion the failure of the bankrupt to return in his schedules the interest complained of, is not necessarily attributable to a fraudulent purpose. Indeed the question of whether he had such an interest as passed under the bankrupt law was not easy of solution. The question of his right to discharge is a close one, but on the whole, we incline to the opinion a discharge should be granted." See, also, In re McCrea (C. C. A.) 161 F. 246, 20 L. R. A. (N. S.) 246, In re Wetmore (D. C.) 99 F. 703, and In re Hamilton (D. C.) 133 F. 823.

An order discharging bankrupt will be entered.